IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN WATERLOO DIVISION

| | |
|---|---|
| WILLIE D. SMITH, a/k/a CHRISTOPHER HUNTER,<br><br>    Plaintiff,<br><br>v.<br><br>OFFICER SHAWN BRAM, OFFICER BRIAN WELDON, and OFFICER JIMMY SCHMIDT,<br><br>    Defendants. | No. 07-CV-2061-DEO<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

_____

This is a 42 U.S.C. § 1983 excessive force case. Plaintiff Willie D. Smith (Smith) alleges the Defendants — Waterloo Police Officers Shawn Bram, Brian Weldon, and Jimmy Schmidt (the Officers) — used excessive force in arresting him on several outstanding warrants. The Officers have moved for summary judgment based on qualified immunity. Because this case presents genuine disputed issues of material facts, the Officers' summary judgment motion must be denied.

**I. BACKGROUND**

During the early morning hours of October 3, 2006, the owner of a 2003 Chevrolet pickup called the Waterloo Police to report the pickup had been stolen. Docket No. 23-2 at 50.

Using the vehicle's OnStar system[1] to pinpoint its location, police quickly found the stolen pickup idling at the stoplight of a nearby intersection. Docket No. 23-2 at 50. Moments later, several officers approached the pickup on foot and ordered the sole occupant, a black male in his mid-twenties, to open the pickup's locked doors. Id. The driver refused, prompting one officer to reach into the pickup's rear driver side window — which the thief had earlier broken out — while a second tried unsuccessfully to break the front driver side window with his nightstick. Id. at 50, 57. The driver then began accelerating, dragging the first officer a short distance before speeding out of sight. Id.

The pursuing officers quickly relocated the pickup parked several blocks away, but by then the suspect had fled on foot through an adjacent alleyway. Id. at 51. Aided by eyewitness accounts, the officers soon located clothing matching the suspect's description lying in the hallway of a nearby apartment building. Id. In the pocket of a pair of jeans, they found an Iowa non-driver identification card bearing the name Willie Smith. Id.

---

[1] "OnStar uses a Global Positioning System ('GPS') involving satellites to pinpoint a vehicle's location." United States v. Coleman, No. 07-20357, 2008 WL 495323, at *1 (E.D. Mich. Feb. 20, 2008).

2

Smith's time on the lam was short. The following day, the Officers were dispatched to a residential area in Waterloo to arrest the fugitive on warrants for first degree theft, eluding police, reckless driving, assault while participating in a felony, and interference with official acts — all stemming from his theft of the pickup and subsequent flight from authorities. Docket No. 23-2 at 49, 52, 54. The Officers were warned that Smith posed an escape risk and was known to carry weapons. Id. at 49, 54. Aware he was being pursued,[2] Smith mounted a bicycle and left the area where he was initially spotted. Id. An officer in the area spotted Smith crossing Newell Street heading south. Docket Nos. 23-2 at 49, 52; 26-4 at 12-14. When the officer approached with his weapon drawn, Smith abandoned his bicycle and continued on foot — shedding his hat and sweater as he went — until reaching the backyard of 415 Wendell Court, where he quickly hid his pants under the back steps.[3] Docket No. 23-2 at 49,

---

[2] Smith first learned that police were actively searching for him when he visited the home of his girlfriend's sister, Celina Jones, on the morning of October 4, 2006, to ask Ms. Jones whether she could drive him and his girlfriend to work. Docket Nos. 26-3 at 3; 26-4 at 9-10. Ms. Jones told Smith that police had stopped by there looking for him not long before his arrival. Id.

[3] When first spotted, Smith was wearing a black sweater, camouflage hat, and camouflage pants. Docket No. 23-2 at 49.

52. Officers quickly began closing off the area to prevent his escape. Id. at 49. Searching the area on foot, Officer Weldon walked behind the residence at 415 Wendell Court and discovered Smith hiding behind a wooden fence there. Id. at 52. Officer Weldon immediately withdrew his firearm and ordered Smith to the ground. Id. Officers Bram and Schmidt arrived moments later. Id. at 52, 54.

At this point the stories of the Officers and Smith diverge. According to the Officers, Smith began backpedaling, looking over his shoulder while moving away as if to find a way to escape them.[4] Docket No. 23-2 at 52, 54. The Officers

---

Smith apparently jettisoned these articles of clothing while being pursued, as Officer Kevin Boyland — the officer who spotted Smith crossing Newell Street — observed Smith was no longer wearing these articles by the time of his arrest in the backyard of 415 Wendell Court. Id. Noticing this upon arriving at the arrest scene, Officer Boyland doubled back toward where he first spotted Smith and found the discarded clothes along the way. Docket No. 23-2 at 49. The Officers do not recall whether Smith was wearing pants at the time of his arrest. Docket No. 23-2 at 32, 40.

[4] Officer Weldon reported that "Smith refused the order [to get on the ground] and began to look and walk in the opposite direction as me. I continued to order Smith to the ground but he began to walk out the exit of the fenced[-]in area . . . [behind 415 Wendell Court] and appeared to be ready to make a run for it." Docket No. 23-2 at 52 (Weldon Invest. Rep., Oct. 4, 2006). Officer Bram similarly reported that Smith "did not comply [with the order to get on the ground], but [instead] started moving [away], looking as if he was going to run." Docket No. 23-2 at 54 (Bram Invest. Rep., Oct. 4, 2006). Bram and Weldons' account was supported by that

4

allege they again ordered Smith to the ground as they began surrounding him, but Smith kept looking over his shoulder as he moved away. Id. at 52, 54. Smith allegedly continued resisting as the Officers holstered their firearms and moved in to place him in handcuffs. Id. The Officers allege Smith refused their orders to place his hands behind his back and instead tried to "lock" his arms together in front of his body to prevent the officers from handcuffing him. Docket No. 23-2 at 52, 54. Officer Bram then sprayed a "short burst" of pepper spray to Smith's facial area. Id. By this point, the Officers had managed to grab hold of Smith's arms and had taken him to the ground face-down, however within moments the Officers allege Smith broke free from their collective grip and again began attempting to place his hands in front of his body. Id. Concerned he might be reaching for a weapon,[5]

---

given by Officer Schmidt, who testified at his deposition that when he arrived in the backyard Officers Weldon and Bram "were ordering [Smith] to get down on the ground, and Mr. Smith was not complying with their verbal orders[,] [but instead] was backing up, looking around side to side," adding, "[based on] my experience, it looked like [Smith] was going to probably flee from the officers." Docket No. 23-2 at 26 (Schmidt Dep., Apr. 30, 2009).

[5] According to their brief in support of summary judgment, it was unclear to the Officers whether Smith was attempting to reach for a weapon or simply trying to escape. Docket No. 23-3 at 2, ¶ 12; see also Docket No. 23-2 at 42 (Bram Dep., Apr. 30, 2009) ("The [pepper] spray didn't seem to have any effect

5

Officer Bram delivered a knee strike to one of Smith's shoulders as the other Officers struggled to subdue him, repeating their order that Smith put his hands behind his back. Docket No. 23-2 at 52, 54. Still, the Officers allege, Smith resisted. Id. Officer Bram then struck Smith's arm multiple times with his ASP baton,[6] and the Officers were finally able to subdue Smith and place him in handcuffs. Id. The Officers brought Smith to his feet and, using a towel, wiped away what they could of the pepper spray to lessen its effect. Id. at 52, 54-55.

Smith remembers the incident in a very different way. Smith's version of the story paints a portrait of the Defendants as overly aggressive officers who assaulted him —

---

on Smith at all. He continued to resist. He was pulling his right hand underneath him. I still did not know if he had a weapon or what he was reaching for.") and 54 (Bram Invest. Rep., Oct. 4, 2006) ("The [pepper] spray seemed to have little effect and [Smith] continued to struggle and pull away. Officer Weldon was attempting to bring [Smith's] hands behind his back, however [Smith] kept pulling them away and putting them underneath himself, attempting to . . . get up. I still did not know at that point if [Smith] had a weapon on him that he was trying to reach, or if he was just struggling to try and get away.").

[6] The ASP baton is a modern nightstick consisting of a 16-inch steel rod that may be extended with a flick of the wrist. United States v. Broadie, 452 F.3d 875, 878, 882-83 (D.C. Cir. 2006). It is "designed so it can be used to control suspects without inflicting serious injury." Id. at 882 (citation and internal marks omitted).

without provocation — *after* he had been handcuffed.  Although he admits running from the first officer who approached him, Smith alleges that when the Defendant Officers approached him he complied fully with their commands and at no time resisted arrest, enabling the Officers to handcuff him just moments after spotting him in the backyard of 415 Wendell Court. Docket Nos. 26-2 at 5; 26-3 at 4-5; 26-4 at 12-16.  Yet despite the fact that he was handcuffed and cooperative, Smith alleges the Officers directed several knee strikes and ASP baton blows to his body, slammed his head into the pavement, and sprayed pepper spray into his eyes while forcibly holding them open.  Docket Nos. 26-3 at 5-6; 26-4 at 16-22.

Smith recalls that, while moving away from the area where he was initially spotted,

> a patrol car pulled up on the sidewalk behind me.  I looked back . . . to see if the officers were stopping me and that is when I saw the police office[r] was already out of his car with his gun drawn.  I panicked and jumped off my bike and, out of shock, I ran and jumped a fence behind a trailer home.  I kept running until I got to a house at 415 Wendell Court, where I sat down and smoked a cigarette, trying to figure out why the officer had charged at me with his gun drawn.  After about five to ten minutes, a tall white male who was wearing a police uniform came from the opposite side of the house where I was.  He ordered me to put my hands up on my head,

7

which I did, and to get to the ground. However, at this time I was on the porch of a home that did not have room to lay down because there was a table and a bunch of other items all over the porch. Therefore, in an effort to comply with the officer's command, I slowly stepped off the porch with my hands up and onto the grass so I could lay down there. By this time, two other officers cam[e] around the front of the house and told me to get down on the ground. I immediately went down on my knees and was beginning to lay down on my stomach when one of the officers ran and tackled me to the ground. Once I was face down in the dirt with handcuffs on, one of the officers said "we will teach your black ass about running from us." The officer who said this was on my back with his knee in the center of my back. The same office[r] pulled my head up and with his fingers held my eyelids open while another officer sprayed mace into my eyes. I kept pulling my head down from the officer's hand and yelling that I could not breath and asking for help. However, the office[r] kept pulling my head up. I tasted blood in my throat and was trying to keep my head down as long as possible. Soon, I began to be beaten by the officers in the back, ribs, and shoulder area with what felt like a metal object. I began to yell for the officers to stop beating me. After the beating finally stopped, one of the officers kneed me in the eye. Then the officer that was on my back got up by putting his hand on the back of my head and pushing himself up. This caused my head to slam to the ground. As I was getting up, I was punched in the other eye before I completely made it to my feet.

Docket No. 28-4 at 11 (Pl.'s Resp. to Defs.' Interrog. # 8).

What transpired next is also hotly disputed. Smith claims he requested medical attention immediately after arriving at the Black Hawk County Jail but was denied treatment. According to Smith,

> I told them I couldn't breath . . . [and that] I was having problems breathing. I guess the nurse and a couple of other deputies and the police officers that were there in the intake [area] . . . laughed and said "You'll be alright[.]"

Docket No. 26-4 at 22-23 (Smith Dep., Jan. 21, 2009).[7] Smith claims the Officers' attack left him with serious physical injuries, including a swollen face, bruises on his back and shoulders, a sore nose, and swollen and blackened eyes. Docket No. 26-3 at 6. Smith also claims that as a result of the attack he suffers emotional distress and mental injuries, including nightmares, post-traumatic stress disorder (PTSD), depression, and night sweats. Id. at 6-7. Smith maintains he

---

[7] It is important to note both that Smith does not base his asserted right to relief on a theory of deliberate indifference to a serious medical need and that Smith testified at his deposition that it was the jail staff, rather than the Waterloo Police, who refused to treat him. See Docket No. 26-4 at 24-25 (Smith Dep.). Indeed, at the summary judgment hearing Smith clarified that his Complaint asserts a claim of excessive force and consequently should be evaluated under the Fourth Amendment. The events occurring after Smith's arrest remain relevant, however, to the extent that they tend to prove or disprove the injuries allegedly resulting from the Officers' use of excessive force during the arrest.

9

never declined treatment and, ultimately, never received any treatment for his injuries while he was jailed at the Black Hawk County facility. Docket No. 26-4 at 26-27. Smith asserts he began seeing psychologists and psychiatrists for the emotional and mental injuries allegedly caused by the Officers when he began serving his sentence at another state facility in February 2007. Docket Nos. 26-3 at 6-7; 26-4 at 28-35. Smith claims his alleged injuries require ongoing treatment in the form of counseling and prescription medication.[8] Id.

The Officers' articulation of the events that occurred after Smith's arrest contrasts sharply with that of Smith. According to the Officers, Smith neither requested nor was denied medical attention while detained by the Officers. Docket No. 28-3 at 3. And although they have no personal knowledge of what took place after Smith was delivered to the jail, at the summary judgment hearing the Officers noted that Smith's claim that jail staff refused his request for medical attention is contradicted by notes from the jail's nursing staff showing both that nurses evaluated and treated Smith's injuries within hours of his arrival and that Smith declined

---

[8] Smith claims his prescriptions include Celexa, Remeron, and Cymbalta. Docket Nos. 26-3 at 7; 26-4 at 34-35.

to see a physician two days later.  Docket No. 28-4 at 3-7.
The notes reflect that Smith initially complained his right
eye was swollen and he felt pain in his left ribs and that he
"state[d] that he would like to talk [with] medical staff
[regarding] eye [and] ribs  prior to entering jail."  Docket
No. 28-4 at 3-7.  The notes further reflect that Smith was
allowed to rinse his eyes within an hour of his arrival at the
jail and that a subsequent evaluation revealed no visible
evidence of injury to his ribs.  Docket No. 28-4 at 7.

As a result of the events of October 3, 2006 — which, in
turn, led to his arrest on October 4, 2006 — Smith was charged
with first degree theft,[9] eluding authorities,[10] assault on a
peace officer by use of a dangerous weapon,[11] and possession
of a fictitious license.[12]  See Docket No. 23-2 at 56-59; State
v. Smith, Case No. FECR142490 (Black Hawk County Dist. Ct.
2006).[13]  Smith pled guilty to, and was convicted of, the

---

[9] Iowa Code §§ 714.1 and 714.2(1).

[10] Iowa Code § 321.279(3).

[11] Iowa Code § 708.3A(2).

[12] Iowa Code § 321.216A(3).

[13] Iowa state court records may be accessed at the following address: www.judicial.state.ia.us/online_records/. See Stutzka v. McCarville, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (addressing court's ability to take judicial notice of

11

theft, eluding, and assault charges and was sentenced to 10 years imprisonment. Id. Claiming they used excessive force in violation of the Fourth Amendment,[14] Smith initiated this action against the Officers under 42 U.S.C. § 1983. The Officers have moved for summary judgment based on qualified immunity.

## II. DISCUSSION

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In order to survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (quoting Cooksey v. Boyer, 289 F.3d 513, 515 (8th Cir. 2002)). The latter of the foregoing determinations is also relevant in the context of qualified immunity. "Qualified immunity involves the following two-step inquiry:

---

public records).

[14] Smith does not challenge the existence of probable cause to support his arrest.

12

(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)); see also Pearson v. Callahan, 129 S. Ct. 808, 818 (2009) (courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first). Because it is undisputed that Officers Shawn Bram, Brian Weldon, and Jimmy Schmidt were acting "under color of state law" when they arrested Smith, the Court need only determine whether the Officers are entitled to qualified immunity.

To determine whether the Officers are entitled to qualified immunity, the Court must first determine whether the facts alleged support Smith's contention that the Officers violated his Fourth Amendment right to be free from excessive force during the course of his arrest. This, in turn, requires Smith to show that the amount of force allegedly used by the Officers was objectively unreasonable under the circumstances confronting them at the time of his arrest. Henderson v. Munn, 439 F.3d 497, 502 (8th Cir. 2006)

(citations omitted). Based on the totality of the circumstances and considering the facts in the light most favorable to Smith (Serna v. Goodno, 567 F.3d 944, 951 (8th Cir. 2006)), the Court concludes Smith has presented evidence in support of his claim that, if believed, would "allow a reasonable jury to find the degree of force used against him was not 'objectively reasonable.'" Henderson, 439 F.3d at 502 (citing Kuha v. City of Minnetonka, 365 F.3d 590, 597 (8th Cir. 2003)).

As previously noted, Smith maintains that, after he had been handcuffed, one of the Officers positioned himself on top of Smith with his knee in the center of Smith's back and began holding Smith's eyes open while forcibly exposing Smith's face to another Officer, who directed a steady stream of pepper spray to Smith's open eyes as he struggled to turn away and gasped that he could not breath. See supra pages 7-9. Smith claims he then felt repeated blows to his back, ribs, and shoulder area with what felt like a metal object. Id. As Smith cried out in pain and yelled for the Officers to stop, one of the Officers directed a knee strike to the left side of his face. Id. Next, the Officer on his back allegedly slammed Smith's head into the ground, using it to support his

14

weight as he stood up.  Id.  Finally, as he began rising to his feet, Smith claims one of the Officers punched him in the right eye.  Id.  Smith claims the Officers' assault caused visible physical injuries that have since healed and lasting psychological harm for which he still receives treatment.  See supra pages 9-10.  Judging the reasonableness of the Officers' alleged use of force from the perspective of reasonable officers on the scene, the Court cannot conclude their conduct was "'objectively reasonable under the particular circumstances.'"  Henderson, 439 F.3d at 503 (quoting Littrell, 388 F.3d at 583).

Urging the Court to reach a contrary determination, the Officers insist that Smith's version of the arrest should be rejected as self-serving and implausible and that their conduct should be found objectively reasonable in light of (1) the seriousness of the crimes for which warrants for Smith's arrest were issued; (2) the threat Smith posed to the safety of the Officers and others; (3) Smith's evasion of authorities on October 3, 2006, and his flight from Officer Boyland minutes before he was arrested on October 4, 2006; (4) Smith's apparent attempt to evade the Officers when they confronted him in the backyard of 415 Wendell Court and ordered him to

stop and get down on the ground; and (5) Smith's active resistance in the course of his arrest, including his attempts to place his hands in front of his body, which reasonably concerned the Officers that he might be reaching for a weapon. Docket Nos. 23-4 at 5-6; 28 at 4-5. However, in advancing these arguments the Officers fail to consider this Court's duty at summary judgment to view the evidence in the light most favorable to Smith, the nonmoving party.

If, as the Officers contend, Smith was poised to escape as they approached, forcefully resisted their attempts to handcuff and arrest him, appeared to be reaching for a weapon, and persisted with violent force despite their attempts to subdue him through force, then the Officers' use of an ASP baton, pepper spray, and other physical force to protect themselves, maintain control of the situation, and subdue Smith would seem reasonable. But if the events more closely track Smith's allegations, then a contrary conclusion would be warranted. Quite simply, this case comes down to the word of Smith versus that of the Officers. Because at this stage all inferences must be drawn in Smith's favor, and the Court must assume his supported allegations are true, the Court cannot choose to believe the Officers' over Smith. Accordingly, the

Court finds Smith has alleged facts which, if believed, make out a violation of his constitutional rights under the Fourth Amendment.

Having determined that Smith's allegations establish a constitutional violation, the Court moves to the second part of the qualified immunity inquiry. At this step, the Court must determine whether the right that was violated was clearly established at the time of the Officers' alleged misconduct. Brown, 574 F.3d at 499 ("'The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" (quoting Saucier, 533 U.S. at 202)). In other words, the inquiry is whether the excessiveness of the force allegedly used by the Officers under the circumstances described by Smith was so apparent that no reasonable officer could have believed in the lawfulness of the level of force. Id. Viewing the facts in the light most favorable to Smith, as it must, the Court finds that the Officers could not have reasonably believed their actions were objectively reasonable in light of the facts and circumstances confronting them. Because Smith presents a factual account that would not permit reasonable officers to apply the force used by the Officers in

17

this case, there is a material factual dispute precluding summary judgment. Therefore, the Court finds the Officers are not entitled to summary judgment on Smith's excessive force claim.

### III. CONCLUSION

For the foregoing reasons, the Officers' motion for summary judgment based on qualified immunity (Docket No. 23) is **DENIED**.

**IT IS SO ORDERED** this 15th day of October, 2009.

*[signature]*
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa